418 So.2d 679 (1982)
SANDERS' CAMPER VILLAGE, INC.
v.
COLEMAN OLDSMOBILE, INC.
No. 14928.
Court of Appeal of Louisiana, First Circuit.
June 29, 1982.
Rehearing Denied August 24, 1982.
Guy A. Modica, Baton Rouge, for plaintiff-appellee Sanders' Camper Village, Inc.
Robert L. Kleinpeter, Baton Rouge, for defendant-appellant Coleman Oldsmobile, Inc.
Before COVINGTON, COLE and WATKINS, JJ.
COVINGTON, Judge.
This is an appeal by Coleman Oldsmobile, Inc., defendant, from judgment of the district court in favor of plaintiffs, Sanders' Camper Village, Inc. and Robert T. Sanders, in the sum of $87,423.05. We reverse and render.
The suit commenced with a petition by Sanders' Camper Village, Inc., a domestic corporation, for injunctive relief against the defendant to protect plaintiff's interest in certain premises on the Airline Highway in Baton Rouge and the inventory of the accessories and parts located thereon.
The defendant filed a peremptory exception on the ground that Robert T. Sanders, a party to the contract alleged, was an indispensable party to the suit. The defendant *680 also filed an answer asserting that the contract had been entered into through mutual error, and that Mr. Sanders had voluntarily agreed to terminate the contract by surrendering the keys to the premises and removing his property therefrom. The defendant asked that the temporary restraining order be dissolved as having been wrongfully obtained.
After hearing on the rule, the temporary restraining order was vacated, and plaintiff was permitted to correct the deficiencies in the petition so as to name the proper party plaintiff and to set forth a cause of action. Thereafter, plaintiff made the appropriate changes in an amending petition. Coleman responded to the amending petition, reasserting its original defenses.
Thus, in the instant action Sanders claims that plaintiffs and Coleman entered into an agreement [Appendix] whereby Sanders was to enjoy peaceable possession of certain premises on the Airline Highway in Baton Rouge for 180 days from the date of the agreement, or until all of the defendant's recreational vehicles had been liquidated, whichever occurred first; and that the defendant transferred to them "all inventory of all accessories and all parts located on the said premises." Under the agreement, Sanders was to liquidate all of the recreational vehicles; he was to retain all profits from the sale of vehicles bearing the "Wilderness" label, with the gross profits being equally shared on other units (less salesmen's commissions). Coleman denied the plaintiffs' claim that there was any agreement, and affirmatively asserted that Sanders voluntarily relinquished the premises to the defendant and that the parties had mutually abrogated the agreement, if any agreement had been made.
The facts giving rise to the present action are that Coleman and Sanders, a former employee of Coleman, negotiated for an agreement, because Coleman wished to get out of or reduce his participation in the handling of the recreational vehicle business, and Sanders was going into a similar type of business. Sanders and Coleman conferred about an agreement looking toward the liquidation of Coleman's recreational vehicles. Coleman was to contribute certain things and the place from which to operate the business of liquidating the units; Sanders was to render a service in disposing of the vehicles. He also was to keep the profit derived from warranty service. Certain inventory of parts was transferred to Sanders, or made available to him for service, repair and warranty work. The terms and provisions of the alleged agreement are in dispute. Nevertheless, under some arrangement, Sanders attempted to liquidate the recreational vehicles for Coleman. As it turned out, the liquidation of the recreational vehicles did not go as well as either party had expected.
The arrangement can, to some extent, be shown from the agreement [Appendix] and from the testimony of Mr. Sanders, as follows:
"THE COURT: All right. Then you were going to occupy that building for a hundred and eighty days rent free; is that right?
"THE WITNESS: Yes, sir. That's correct.
"THE COURT: Okay. The agreement says here that you get all of the parts
"THE WITNESS: Yes, sir. That's correct.
"THE COURT: and accessories.
"THE WITNESS: Yes, sir.
"THE COURT: You got the Wilderness vehicles.
"THE WITNESS: I had to buy the Wilderness. That was more of a liability now. That was part of the agreement.
"THE COURT: I know. What I'm trying to say, you got the Wilderness vehicles, but you were going to have to pay off the floor plan.
"THE WITNESS: That's right. Which I had to carry the floor plan and get rid of them on my own. That was part to his benefit on that.
"THE COURT: Well, why was that to his benefit?
"THE WITNESS: Well, put it this way. When you take on that many trailers at *681 that time when business was that bad, you knowIn fact, I don't evenI cancelled the Wilderness franchise when I got rid of the rest of the trailers.
"THE COURT: Did you lose money off of that?
"THE WITNESS: It's hard to say. I probably broke out about even by the time profits and floor plans and everything else. I could have lost a little or could have made a little on them.
"THE COURT: So you brokeSay you broke even on that.
"THE WITNESS: Okay.
"THE COURT: All right. You were going to perform the warranty service.
"THE WITNESS: Yes, sir. That's correct.
"THE COURT: And you were going to keep any of the profit from the warranty service.
"THE WITNESS: Yes, sir.
"THE COURT: And you were going to get fifty percent of the profits and he was going to get fifty percent of the profits from the sale of the other vehicles; is that correct?
"THE WITNESS: After salesmen's commissions were paid.
"THE COURT: Okay. You were going to hire the employees. You were going to run the shop; is that right?
"THE WITNESS: Yes, sir. I was paying all employees, the office employees and the shop and the sales. Well, sales, we were actually really paying fifty/fifty, because it was fifty percent after salesmen's commissions so I guess he, you knowWe were really both paying sales people.
"THE COURT: All right. What was going to happen if there were vehicles left at the end of the hundred and eighty days? Mr. Coleman was going to keep them?
"THE WITNESS: We had talked about it. He talked about extending it at that part. The way the contract just black and white says, he will have the balance of the vehicles and have to liquidate the balance himself.
"THE COURT: As I compute this now, at the beginning of the contract there was some ninety-two thousand dollars [$92,000.00] worth of parts and accessories, right?
"THE WITNESS: Yes, sir. That's correct.
"THE COURT: From your testimony, indicates that during the period of the contract, if the contract would have gone the whole time, there were forty-three vehicles sold, counting the ones you took off of his hand.
"THE WITNESS: Right, that was within three months time, about three and a half months time.
"THE COURT: Now, if your net profit figure is right, of those forty-three, let's say forty-three,Forty-three vehicles sold. Your net profit figure, if you add, if you multiply that times twelve hundred dollars, that's fifty-one thousand six hundred dollars, right?
"THE WITNESS: Right.
"THE COURT: You'll accept that figure?
"THE WITNESS: Yes, sir.
"THE COURT: Divide that by two. That means that you are going to get twenty-five thousand three [eight] hundred dollars, right?
"THE WITNESS: Yes, sir.
"THE COURT: And Mr. Coleman gets twenty-five thousand eight hundred dollars.
"THE WITNESS: That's correct.
"THE COURT: In addition, if the agreement is interpreted the way that you contend it's interpreted, you get the profits on the warranty work.
"THE WITNESS: I get the total amount on the warranty work.
"THE COURT: The total amount of the warranty service.
"THE WITNESS: The part was a hundred percent profit.
"THE COURT: That's right, the total amount of the warranty work. You get the place rent free. In addition, you get ninety-two thousand, seventy-two *682 dollars and ninety-seven cents of parts and accessories, right?
"THE WITNESS: Yes, sir. That's correct.
"THE COURT: All right. This means that over the period of life for this contract the cash basis is that counting the parts, if everything would have gone to the end of the contract, you would have gotten a cash flow plus the warranty agreement, without the warranty work, you would have gotten $117,872.97.
"THE WITNESS: Yes, sir.
"THE COURT: And Coleman would have gotten $25,800.00.
"THE WITNESS: That's right.
"THE COURT: Now, you have been in business a long time. Now, tell me how that would benefit Mr. Coleman?

"THE WITNESS: Sir, I didn't ask for the contract, first of all. It was brought to me. Okay. Now, Mr. Coleman wanted out of the business." (Emphasis added.)
Although sales language is used to a certain extent and the arrangement between the parties has certain characteristics of a contract of sale, the agreement is more nearly a kind of limited partnership and lease than it is a sale. It is also apparent from the circumstances that the inventory was to be used in conjunction with the liquidation of the recreational vehicles. It was not just given to Mr. Sanders. The principal motive of the agreement was the liquidation of the vehicles, with Coleman, more or less, getting out of that type of business and with Sanders getting more involved with that or a similar type of business. The agreement had a limited term of duration. Under no circumstances was the arrangement between the parties to last more than 180 days (and hopefully the parties could close it out sooner than that, with the liquidation of all the recreational vehicles). It was the intention of both parties that the recreational vehicles were to be liquidated as quickly as possible (but in not later than 180 days).
Both parties must agree to the substantial elements of a contract to have a binding obligation. LSA-C.C. arts. 1779(2), 1798; Custom Builders & Supply, Inc. v. Revels, 310 So.2d 862 (La.App. 3 Cir. 1975). Contracts are founded on the agreement of the parties; where they misunderstand each other, there is no contract. Cheramie v. Stiles, 215 La. 682, 41 So.2d 502 (1949). Error in the principal cause of the contract invalidates consent and is sufficient reason to rescind a contract. LSA-C.C. art. 1825; Walker v. Don Coleman Construction Company, Inc., 338 So.2d 1183 (La.App. 2 Cir. 1976); Hoff, Error in the Formation of Contracts in Louisiana: A Comparative Analysis, 53 Tul.L.Rev. 329 (1979).
LSA-C.C. art. 1841 states:
"Error as to the nature of the contract will render it void.
"The nature of the contract is that which characterizes the obligation which it creates. Thus, if the party receives property, and from error or ambiguity in the words accompanying the delivery, believes that he has purchased, while he who delivers intends only to pledge, there is not [no] contract."
It is well settled that when one of the parties errs in perceiving the very nature of the contract into which he enters, the contract cannot be enforced against him. Becker and Associates, Inc. v. Lou-Ark Equipment Rentals Co., Inc., 331 So.2d 474 (La.1976). We are convinced from the evidence that Coleman would not have entered the agreement if he had been aware that the agreement was to be treated by Sanders as a sale of the recreational vehicle business, including all vehicles and the inventory of parts and accessories, to Sanders.
We find the trial court erred in treating the inventory of accessories and parts as having been sold by Coleman to Sanders under the agreement. There was never any intention that the inventory belonged to Sanders irrespective of whether he fulfilled his obligations under the contract.
Moreover, we find that regardless of how the agreement between these parties is categorized, it was abrogated by their mutual consent on April 17, 1980.
*683 Coleman testified that he had been informed that Sanders wanted out of the deal, inasmuch as sales were bad and Sanders had his own business, Sanders' Camper Village, Inc., on Florida Boulevard. They held a meeting on April 17,1980; and Sanders handed him the keys, then left to obtain personal property. Sanders testified that although he was in business at another location, he wanted to complete his contract; but Coleman told him at the April 17 meeting that he needed the premises because he was going into the mobile home business himself. Sanders stated that Coleman demanded the keys, but did not threaten him or physically take the keys from him; he handed Coleman the keys.
Concerning the testimony of other persons in attendance at the meeting, M. A. Simmons testified that Sanders had spoken with him about getting out of the deal with Coleman, so he had told Coleman about this. Simmons also testified that no one was satisfied with sales at the RV Center. Simmons said that Sanders voluntarily handed the keys to Coleman, and left the premises. This testimony was corroborated by that of Russell A. Barbay who testified about what Sanders had said to him about the matter. He also stated that Sanders voluntarily surrendered the keys to Coleman and left the premises, after getting his personal belongings.
An agreement legally entered into has the effect of law on those who have formed it; nevertheless, it is well recognized that agreements may be modified, abrogated, or revoked by mutual consent of the parties. LSA-C.C. arts. 1901, 1945, 2130; Arceneaux v. Adams, 366 So.2d 1025 (La.App. 1 Cir. 1978); Bruhl v. White, 346 So.2d 734 (La.App. 1 Cir. 1977), writ refused, 349 So.2d 1268 (La.1977); Christ v. Christ, 251 So.2d 197 (La.App. 3 Cir. 1971); Noto v. Blasco, 198 So. 429 (La.App. 1 Cir. 1940).
In the instant case, Sanders had other business interests which needed his attention and to which he wanted to devote more of his time, as he expressed on several occasions to Simmons and to Barbay. This information was relayed to Coleman, and a meeting was arranged. After the meeting on April 17, 1980, in the presence of Simmons and Barbay, Sanders voluntarily gave the keys to Coleman, obtained his personal belongings, and departed from the premises. After discussing the matter with his attorney, Sanders did come back, in an effort to regain possession of the premises. His return did not have the effect of reviving the contract, which had already been mutually terminated. Under the circumstances, we hold that the parties abrogated their agreement or arrangement by mutual consent on April 17, 1980.
For the assigned reasons, we reverse the judgment appealed, and render judgment in favor of defendant, Coleman Oldsmobile, Inc., dismissing the plaintiffs' suit at their costs.
REVERSED AND RENDERED.

APPENDIX
STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE
THIS AGREEMENT MADE AND ENTERED INTO on this 31 day of January, 1980, by and between:
COLEMAN OLDSMOBILE, INC., a Texas corporation authorized to do and doing business in the State of Louisiana with its principal place of business located at 9150 Airline Highway, Baton Rouge, Louisiana, represented herein by its duly authorized President, Robert E. Coleman, hereinafter referred to as "Seller"; and,
SANDERS CAMPER VILLAGE, INC., a domestic corporation domiciled in the Parish of East Baton Rouge, State of Louisiana, represented herein by its duly authorized officer and agent, Robert T. Sanders, and ROBERT T. SANDERS, a resident of lawful age of the Parish of East Baton Rouge, State of Louisiana, hereinafter referred to as "Buyer";
WHEREAS, "Seller" owns and operates Coleman RV Center situated on Airline Highway, Baton Rouge, Louisiana adjacent to and in conjunction with Coleman Oldsmobile, *684 Inc. situated at 9150 Airline Highway; "Seller" desires to liquidate the recreational vehicle business and to transfer certain assets for the considerations to be hereinafter stipulated; and,
WHEREAS, "Buyer" is engaged in and desires to engage in the recreational vehicle business including warranty work, maintenance, service and repairs and desires to acquire certain recreational vehicles, parts, equipment and other related and incidential [sic] items:
WITNESSETH:
For and in consideration of the covenants, stipulation and agreements hereinafter set forth, "Seller" and "Buyer" do hereby agree, stipulate and contract as follows:
1. "Seller" transfers, assigns, and delivers unto "Buyer":
(A) The occupancy, rent free, and with all utilities including electricity, gas, water and phone, all as is, of that building occupied on Airline Highway as Coleman RV Center for a period of 180 days from the date of this agreement or until all recreational vehicles belonging to "Seller" have been liquidated, provided this occurs prior to the lapse of 180 days.
(B) All inventory of all accessories and all parts presently located on the premises herein described.
2. "Seller" transfers, conveys, assigns and delivers unto "Buyer" all recreational vehicles-on the premises manufactured or bearing the manufacturer's label of "Wilderness".
3. "Buyer" agrees and consents to the stipulations and convenants hereinabove set forth and additionally, "Buyer" agrees that [in the consideration of the premises and the occupancy of the same together with the accessories, parts and recreational vehicles made available to "Buyer",] "Buyer" will sell, service, maintain and render warranty service and repair work on all recreational vehicles presently located on the premises and presently consigned to, on or covered by the floor plan of "Seller" with "Buyer" keeping any and all profit from such repair service or warranty work.
4. "Buyer", will pay any and all sums due either on the floor plan or to the manufacturer of any recreational vehicle bearing the "Wilderness" label, and will retain any and all profits therefrom. In the sale of all other units belonging to "Seller", "Seller" and "Buyer" will split the gross profits on the basis of 50% to each, less any commission due any salesman.
5. "Buyer" further stipulates and agrees to be responsible for the payment of all commissions, salaries, taxes, social security on all employees employed by "Buyer" and to pay any and all expenses incidental to and related to the service, repair, warranty repair or maintenance of any of the vehicles covered by this agreement with "Buyer" keeping all profits therefrom.
6. "Buyer" further agrees that in transacting any business either with manufacturers, distributors, suppliers or with retail or wholesale customers, to make it understood and clear that such business is being conducted with "Buyer" and that "Seller" is not connected with or involved in any such transactions subsequent to the date of this agreement.
7. "Buyer" agrees and stipulates that he will maintain the premises of which it has been given occupancy as a prudent administrator, maintaining and keeping the same in good shape, ordinary wear and tear excepted, and will additionally preserve and protect any and all recreational vehicles on the premises.
8. "Buyer" further agrees, as an additional consideration for this agreement, to make every effort to completely liquidate the entire stock of recreational vehicles and will put forth his best efforts in order to liquidate all assets and recreational vehicles belonging to "Seller" in order that "Seller" may withdraw from the recreational vehicle business.
9. "Seller" warrants that he is the owner of the premises to be occupied by "Buyer" and that "Buyer" shall enjoy peaceful possession of the same for the period of time stipulated herein conditioned upon "Buyer" faithfully performing each and every *685 stipulation, agreement and convenant herein provided.
THUS DONE AND SIGNED on this 31 day of January, 1980, in the presence of the undersigned witnesses and the parties hereto.
WITNESSES: COLEMAN OLDSMOBILE,
 INC., d/b/a COLEMAN
 RV CENTER
/s/ Russell A. Barbay BY: /s/ Robert E. Coleman
 ROBERT E. COLEMAN,
 President
/s/ M. A. Simmons SANDERS CAMPER
 VILLAGE, INC.
 BY: /s/ Robert T. Sanders
 ROBERT T. SANDERS
 /s/ Robert T. Sanders
 ROBERT T. SANDERS,
 Individually